IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JB OXFORD & COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Judge Nixon |
| v. | ) | Magistrate Judge Griffin |
| | ) | Case No. 3:03-1117 |
| FIRST TENNESSEE BANK NATIONAL | ) | |
| ASSOCIATION and THOMPSON & | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM ORDER

Before the Court is Defendants' Motion for Summary Judgment and supporting

documents (Doc. Nos. 43, 45, 46, 47, 54, 55), to which Plaintiff has responded (Doc. Nos. 49,

50, 51, 57, 70). For the reasons stated herein, the Court GRANTS in part and DENIES in part

Defendants' Motion for Summary Judgment.

Plaintiff JB Oxford & Company ("JB Oxford") filed its First Amended Complaint on

February 20, 2004 alleging that certain audio-visual and print advertisements of Defendant First

Tennessee Bank National Association ("First Tennessee"), which were created and produced by

Defendant Thompson & Company ("Thompson"), infringe JB Oxford's copyrighted

advertisements in violation of the Copyright Act, 17 U.S.C. § 101 et seq., and constitute "reverse

passing off" or unfair competition in violation of the Lanham Act, 15 U.S.C. § 1051 et seq.[1]

Defendants seek summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil

Procedure, dismissing JB Oxford's First Amended Complaint in its entirety.

---

[1] Plaintiff also alleged a claim of unfair competition under Tennessee state law in its
original complaint. As Plaintiff did not re-allege its state law claim in its First Amended
Complaint, it is no longer at issue.

# I.     BACKGROUND

## A.     Plaintiff's Advertisements

JB Oxford is a financial services firm that offers securities brokerage, banking and related financial services. Its services are available online, and it has customer accounts nationwide. Beginning in September 1999 and ending in December 1999, JB Oxford ran an advertising campaign featuring a balding, Caucasian male dressed in a costume designed as an exact replica of a United States one dollar bill. The costume is a boxy, rectangular one dollar bill that looks more like a stack of dollar bills, rather than a single bill. The bill is worn vertically, such that the top is some inches above the actor's head, and the bottom ends just above the knees. The actor's face protrudes from a hole in the costume, just above the picture of George Washington, where the Federal Reserve Bank circle of information normally appears. The actor's arms and legs, which are covered in a white, form-fitting garment, protrude out of the box, and he appears to be wearing black sneakers.[2]

The actor thus costumed is named "Bill." He is portrayed as lazy, as a metaphor for money that is not earning interest or any other form of investment return. The advertisements suggest that Bill can be "put to work" in an investment vehicle offered by or through JB Oxford. This advertising campaign appeared on television, in print media, on the Internet, in JB Oxford brochures and other print items. At issue in this case are JB Oxford's three television commercials and one print advertisement featuring Bill.

The first television commercial is entitled "Loafing Television." It begins in a dark

---

[2]  The actual design and construction of the JB Oxford one dollar bill costume is unclear because the manufacturer cannot be located, records concerning the design and construction of the costume have been lost, and JB Oxford does not have an exemplar.

living room with the television switched on and a coffee table strewn with a take out pizza box, Chinese food cartons, drinks, and other paraphanelia. The camera rises from the back of the couch revealing an outstretched arm and hand holding a remote control. The viewer can gather that a person is lying on the couch and is poised to switch the channel. At that moment, another Caucasian man dressed in business casual walks in, brusquely draws open the curtains, flooding the living room with daylight and revealing a view of a downtown city. The man shouts in exasperation: "OK! That's It." The person on the couch sits up when the curtains are drawn, and is revealed to be Bill, the balding, Caucasian male in the one dollar bill costume. The man dressed in business casual attire informs Bill that he is tired of working while Bill sits around, and states that he has "put [Bill] to work." Bill, sitting up on the couch and on the verge of tears, retorts that he "is earning next to nothing," and he might as well be buried in the yard. Bill then suggests that the man needs help and that they should call JB Oxford and get on the Internet. The man likes the suggestion, the two resolve their argument and the commercial switches to show JB Oxford's contact information. The commercial returns to Bill and the man, and Bill, attempting to please, states that he "found some change in the sofa." The commercial ends with a screen showing a blue and black square. "Put your money to work" appears in the top half of the square, and "JB Oxford.com" in the bottom half.

The second television commercial is entitled "Slinky Television" and also features Bill, the balding, Caucasian male in the one dollar bill costume. Bill is in the same downtown apartment in the middle of the day. Bill is sitting on the couch, in a good mood, playing with a slinky and listening to music. A male voice over asks "What is your money doing right now?" Bill gets more animated with the slinky, and the voice over states: "You don't really know, do

you?  You could put it to work with us."  The voice over identifies JB Oxford and some of its

services, as the screen shows a telephone number for JB Oxford.  The voice over urges the

viewer to call JB Oxford.  Bill reappears staring, somewhat perplexed, at the slinky which is

completely tangled up, and the voice over informs the viewer:  "Your money needs all the help it

can get."  The commercial ends with a screen showing a blue and yellow square.  "JB

Oxford.com" appears in the top half of the square, and "Put your money to work" in the bottom

half.

The third commercial is entitled "Restaurant Television."  This commercial is set in a

restaurant and begins by showing a woman sitting at a table.  The woman has a concerned look

on her face and asks her companion "Bill" (who we cannot see) what is wrong.  Bill, who is the

same balding, Caucasian male in the one dollar bill costume from the previous two commercials,

appears and states that he is "feeling a little neglected."  The woman protests, while Bill states

that he needs more and that he wants to "circulate."  Bill suggests using JB Oxford, and the

woman concludes that he is "worth every penny."  The commercial ends with Bill taking the

check from the waiter and declaring in a suave tone, "I got this."  The final screen shows a blue

and black square.  "Put your money to work" appears in the top half of the square, and "JB

Oxford.com" in the bottom half.

The fourth is a print advertisement entitled "Loafing Print," and features Bill, the same

balding, Caucasian male in the one dollar bill costume.  He is in the same apartment that

appeared in "Loafing Television" and "Slinky Television."  This time, he is reclining on the

couch, with his feet on the coffee table.  In the crook of one arm is a bowl of popcorn, and in the

other hand is a remote control.  On the coffee table there is left-over Chinese food, a half-opened

-4-

pizza box and other sundries.  Below this image, the following appears:  "Brokerage and banking services, plus free Internet access.  This ought to keep your money busy."  In smaller text the advertisement asks, "Ever wish your money would get up and get to work?  Just call JB Oxford." It then lists the services that JB Oxford provides and concludes with, "Either way, we'll make it easy for you to put your money to work."  The advertisement includes other graphics, and a phone number and website for JB Oxford.[3]

The "Loafing Television" and "Slinky Television" commercials were broadcast from October through December 1999.  These television commercials ran nation-wide on A&E, Animal Planet, CNBC, CNN, The Discovery Channel, Lifetime Television, TBS, and TNT, and in Chicago, Los Angeles, New York, Philadelphia, and San Francisco on local affiliates of ABC, CBS, Fox, NBC, UPN, and WB.  It is unclear whether the "Restaurant Television" commercial appeared on television because JB Oxford could not determine whether or when it was run. "Loafing Print" ran in the New York Times, Wall Street Journal, Newsweek, and Time beginning in October 1999.  Plaintiff also alleges that its "Internet banner advertisements" appeared on the web sites of America On Line, CNN, MSNBC, Netscape, The New York Times, The Wall Street Journal, and various other newspapers.  While the advertisements were available to viewers in Tennessee through the cable channels, the print media and the Internet, it is unclear how often they appeared in these national fora.  All the JB Oxford advertisements featuring Bill

_____

[3]  JB Oxford also created a print and Internet advertisement entitled "Circulate," that shows Bill dancing with two attractive women.  JB Oxford has been unable to determine if "Circulate" ever ran, has not submitted a certificate of copyright registration for "Circulate" to this Court, and does not make any allegations of copyright infringement regarding "Circulate" in its First Amended Complaint.  As copyright registration is a precondition to filing a copyright infringement lawsuit, JB Oxford does not, and cannot, rely on "Circulate" for any part of its infringement claims.  17 U.S.C. § 411(a).

were discontinued at the end of 1999 and were never run again. JB Oxford spent approximately $8,533,923.67 on this advertising campaign.

JB Oxford did not register "Loafing Television," "Loafing Print," "Slinky Television," and "Restaurant" for copyright protection at the time of their use. Instead, JB Oxford registered "Loafing Print" and "Loafing Television," effective October 28, 2003, and "Slinky Television" and "Restaurant Television," effective January 28, 2004, as a prerequisite to filing this lawsuit. JB Oxford has no trademark registrations relevant to this case. It filed for service mark protection for the phrase "Put Your Money To Work" in August 1999. The application, however, was declared abandoned in April 2001.

### B.    Defendants' Advertisements

First Tennessee is a full-service provider of financial services based in Tennessee, and offers investment, banking and related financial services. In approximately the third week in December 2000, First Tennessee held a meeting with Thompson, an established advertising agency located in Memphis, Tennessee, to discuss a potential new advertising campaign. First Tennessee wished to advertise, among other things, a "Priority Choices Checking" account. This checking account involved a "sweep feature" whereby any balance over $5,000 would be placed automatically in a money market fund. First Tennessee wanted to begin broadcasting advertisements for the new campaign during the Super Bowl on January 28, 2001, giving Thompson a very short time for creation and production.

Following the initial meeting, Thompson personnel drafted a creative strategy brief outlining the goals for the advertising campaign. The brief stated that First Tennessee wished to

-6-

target customers in the affluent market. Research indicated that while most did not, a certain percentage of affluent customers believed a bank would "help [them] make money." (Doc. No. 47, Ex. 87 at 2.) According to the brief, the point to be communicated by the advertising campaign was that the "sweep feature does all the work for them." (Id. at 3.)

One evening after the December 2000 meeting with First Tennessee, Iddo Patt ("Patt"), the Broadcast Producer for Thompson, and Richard Baptist ("Baptist"), a graphic designer at Thompson, met to discuss the concepts for the campaign. Patt conceived the idea of a dollar bill taking on human characteristics. Patt "suggested the idea of . . . a person sitting–reclining on the beach, a dollar bill walked up next to him, the person on the beach says to the dollar bill, What are you doing here. The dollar bill says, Well, they put me in a checking account so I didn't really have a lot to do, so I'm just here on vacation. And the person says, well that's funny because I put my money at First Tennessee and its working hard. And I got this travel card, so here I am on the beach." (Doc. No. 47, Ex. 73 at 15.) The dollar bill was to be represented by an actor in a dollar bill costume.

This concept was thereafter refined to show three actors in dollar bill costumes lounging around in a living room in front of a television.[4] This "lazy" money is swept away by a broom, and industrious, "working" money is shown in a factory creating "new" money. The "new" money then jumps into an ATM ready for the customer's use. The money is always represented by actors in costumes of dollar bills of various denominations. This refined storyboard was presented to First Tennessee on December 27, 2000. Included in the storyboard presented to

---

[4] The deposition testimony conflicts as to who participated in the refinement of the original concept and when such refinement occurred. There is no doubt, however, that Patt was the principal creator of the concept, and Baptist created the initial sketches.

-7-

First Tennessee was the phrase "Put your money to work with Priority Choices from First Tennessee." (Doc. No. 47, Ex. 88.) Thompson also presented to First Tennessee two alternative ideas involving a mechanized bull and money boxes. First Tennessee immediately liked the "lazy" to "working" money idea better than the other ideas.

At around the same time as the presentation, Thompson began collaborating with Picture Park Studios in Boston to produce a television commercial of the "working" money concept. On or about January 8, 2001, production began, although Trace Hallowell ("Hallowell"), Thompson's creative director, continued to fine-tune the script and storyboard. By this time, three television commercials were being prepared. The first was a script that involved the original storyboard of three "lazy" bills lounging around in front of a television, a factory where the industrious, "working" bills are producing more money, and a final shot of the "new" money jumping into an ATM slot ready for use. The second script was the same as the first, except it included a promotional item, such as a DVD or a Palm Pilot. The third script, although involving actors in dollar bill costumes, was very different from the original storyboard presented to First Tennessee and the first two scripts. This involved one actor in a dollar bill costume portraying a "money coach." The "money coach" represents First Tennessee, and is conducting a class encouraging other actors in dollar bill costumes to work harder. None of the scripts originally included the phrase "put your money to work." On or around January 9, 2001, Hallowell added the phrase "put your money to work at First Tennessee" in all three of the television commercial scripts.

On December 28, 2000, after receiving a copy of the original storyboard, Robert Field "Fields," the principal of Foam Props who was contacted to create the costume, submitted a bid

-8-

for its production. The bid was for construction of a rigid box-shaped costume. However, the design of the costume changed from a box to an envelope. On January 4, 2001, Fields revised the bid and stated: "We'll scan real dollar bills and have them printed on fabric. We'll sew two sheets of fabric together to form a 30" x 70" sleeve. We'll make flexible foam inserts and cut out head and arm holes." (Doc. No. 47, Ex. 96.) Thus, Defendants' costumes are relatively thin and are of various denominations (hereinafter, "money costumes"). The money costume is worn vertically, starting several inches above the head and ending below the knees, with cut outs for the head, arms and legs.

The advertising campaign began with the "Lazy Money" television commercial in a thirty-second Super Bowl spot on January 28, 2001. Lazy Money begins with three actors in money costumes, portraying lazy one dollar bills. The actors are all Caucasian males, who appear to be out of shape, and one is bald. All are wearing white, form-fitting garments to cover their legs and arms, but are not wearing shoes. They are in a poorly lit living room. Two one dollar bills are sprawled on the couch, while the third is on a reclining chair. All three are facing the television, which appears to be showing cartoons (although the viewer can only hear the music). The coffee table is strewn with Chinese food cartons, a bag of potato chips and other items. A male voice over states "Do you have lazy money? You do if it sits around in a regular checking account." The image cuts to a busy, clean, brightly illuminated factory setting where males of different races dressed in money costumes of ten or twenty dollar bills are standing at a machine. This working "money" is inspecting and stamping "new money" coming out of the machine. The "new" money is portrayed by male actors of different races in money costumes of ten or twenty dollar bills. The "working" and "new" money are wearing white, form-fitting

garments to cover their arms and legs, and appear to be in better shape than the "lazy" money. The voice over states: "Your money could be working harder in First Tennessee's Priority Checking," and goes on to explain the features of the checking account. The image then shows a large white sign, flashing ATM in red and beeping. One of the "working" money, holding a clipboard and representing a manager, starts organizing the "new" money. The "new" money starts filing towards the opening of an ATM machine and jumping in. The voice over informs the viewer: "The best part is that your money is always there when you need it," and concludes with "Put your money to work at First Tennessee." (Doc. No. 47, Ex. 6.)

First Tennessee also made a print advertisement based on the "Lazy Money" concept. The print advertisement involves a balding, Caucasian male in a one dollar money costume. A white, form-fitting garment covers his arms and legs and he is not wearing any shoes. He is sitting on what appears to be a "La-Z-Boy" chair, or other type of reclining chair. It is difficult to tell from the copy provided to the Court, but it appears he is holding a remote control in his right hand, implying he is watching television. Beside the image, the advertisement states: "How to tell if you have lazy money and what to do about it." Below the image appears four paragraphs of smaller print, in which the Priority Choices Checking is explained. The final paragraph exhorts the reader to "Sign up today . . . [and p]ut your money to work in Priority Choices Checking . . . ." The bottom of the page features a First Tennessee logo, and their slogan "All Things Financial." (Doc. No. 47, Ex. 5.)

The rest of the advertising campaign features ten vastly different television commercials. All of them involve an actor or actors of varying races and sexes in the same money costumes depicting various denominations of United States Currency. The first is entitled "Money

Coach," and involves a Caucasian male in a twenty dollar bill money costume.  He is wearing a white baseball cap with a dollar symbol ("$") on the front of the cap and a whistle dangles out of the opening in his money costume.  He introduces himself as "Bill" the "money coach."  He is in a gym with other males of various races wearing the same money costume in various denominations, but without the baseball cap.  The other money follows an exercise regimen of weights, push-ups, and running, among other things, while Bill the money coach exhorts them to work harder.  At the same time, Bill the money coach is informing the viewer that he "trains the money to work hard," and then describes the features of the Priority Checking account.  (Doc. No. 47, Ex. 7.)

The second is entitled "Kung Fu Money," and is set in a garden with East Asian symbols, such as lion statues, and flags with the dollar symbol ("$") painted in East Asian calligraphy.  A Caucasian male in a one hundred dollar bill money costume walks around the garden.  On his head is a green sweat band with a white dollar symbol ("$").  Underneath his costume, he is wearing a white, baggy Kung Fu uniform.  He is portraying a Kung Fu instructor.  Scattered at various places in the garden are other actors dressed in various denominations of the money costumes, with the Kung Fu uniform underneath.  These actors portray students in a Kung Fu class, and are practicing Kung Fu techniques.  The Kung Fu "money" instructor walks by them teaching them skills and fending off surprise attacks.  As he walks, teaches, and protects himself, he describes the features of First Tennessee's insurance program, and how it will "protect" your money.  (Doc. No. 47, Ex. 8.)

The third is entitled "Scary Money," and is set in a middle-class family's home during a stormy night.  The husband and wife are in front of the computer discussing finances, and

-11-

despairing over how they are going to redo the kitchen and send their son to college. In the background over lightening flashes and thunder, the couple begins to hear noises, as if the house is haunted. The couple gets up to investigate, and the screen cuts to the air vent. Hiding in the vent are three male actors of different races in one hundred dollar bill money costumes. They are holding torches at their chins, so the light is shining on their faces in a ghostly manner, and they are shouting "get out" in creepy voices. They are playing a "ghost" prank on the couple, pretending the house is haunted. A female voice over explains: "Get the money out of your house with a home equity loan from First Tennessee. You can even get a tax deduction, how scary is that?" (Doc. No. 47, Ex. 9.)

The fourth is entitled "Beach Money," and features a woman in a red bathing suit and a Caucasian man in a one hundred dollar bill money costume. They are on a beach and running (in slow motion, of course) from opposite ends towards each other with outstretched arms. The voice over urges the viewers to "meet the money" of their dreams by entering the First Tennessee Sweepstakes to win up to $100,000, among other prizes. When the woman meets the one hundred dollar bill, they exchange amorous looks, lock hands, dance in a circle and start walking into the sunset. Over this scene, the voice over states: "You could walk away with $ 100,000." (Doc. No. 47, Ex. 10.)

The fifth is entitled "Swimming Money," and features a Caucasian male coach for a synchronized swimming team and his team of Caucasian female synchronized swimmers. The setting is a swimming pool at a resort, with palm trees and cascading fountains. The coach is in a one hundred dollar bill money costume, and the swim team is in ten dollar bill money costumes. The women appear to be wearing only a bathing suit under their money costumes,

-12-

leaving their arms and legs bare, and a swimming cap.  Under his money costume, the coach is

wearing a white, form-fitting garment to cover his arms and legs.  The coach is singing:  "Things

work better when your money works together.  Think of what your money can do."  As the

coach sings, the swim team dives into the pool, and starts performing its synchronized swimming

act.  The coach continues to sing through certain features, such as financial services

coordination, that First Tennessee is promoting.  (Doc. No. 47, Ex. 11.)

The sixth is entitled "Smart Money."  The first scene involves a Caucasian man in a one

hundred dollar bill money costume swinging a stick at a bee hive and yelping when the bees start

attacking him.  The second scene shows two Caucasian men, one in a ten dollar bill money

costume, and the other in a twenty dollar bill money costume.  The two are trying to figure out

how to screw in a light bulb.  A man dressed in casual clothes walks out and shows them how to

do it.  The voice over states:  "On its own, money is not smart.  It needs instruction, guidance.

Like the kind offered at First Tennessee."  The image then cuts to the man in casual attire taking

the "money" to a First Tennessee branch, where they are placed in a classroom setting with other

students in money costumes, and two instructors dressed in regular, business suits.  During this

time, the voice over explains that First Tennessee's financial planners can help with numerous

financial features so that your "money can wise up and work harder."  The advertisement ends

with the "money" graduating from the class.  (Doc. No. 47, Ex. 12.)

The seventh is entitled "Rowdy Money."  The first scene involves a Caucasian man and

woman in money costumes running up to a house, ringing the doorbell, and then running away.

The second scene cuts to a convertible careening wildly in the dust.  The convertible is filled

with five people of different sexes in money costumes of various denominations, wearing

-13-

sunglasses, holding their arms up, and screaming.  The voice over states:  "Left to its own devices, money can get out of control."  A regularly dressed couple then takes the "money," against its will, to a First Tennessee branch.  There the "money" is put through boot camp, supervised by representatives of First Tennessee in regular business suits.  As the "money" undergoes boot camp, the voice over explains that First Tennessee offers a "strict regimen of discipline and guidance," and then explains the features of the Priority Checking account.  The "money" lines up and receives medals of graduation from the representatives of First Tennessee. The commercial ends with a Caucasian man in a money costume obtaining a tattoo.  The voice over states that First Tennessee keeps your "money doing the right thing, and never out of control."  (Doc. No. 47, Ex. 13.)

        The eighth is entitled "Neglected Money."  The first scene involves a Caucasian male in a one hundred dollar bill money costume on the second floor of a house.  He is looking out of the window on a sunny day, appearing sad and lonely.  The voice over asks:  "Are you there for your money?"  The actor in the money suit runs downstairs with a baseball glove and a baseball, and tries to get the couple of the house outside to play, but they are busy at the computer.  The voice over states:  "Maybe you don't have time?"  Then it cuts to the "money" taking the couple to a First Tennessee branch and ushering them in.  During this time, the voice over explains that with the longer hours at First Tennessee, the viewer can give its money the attention it needs.  The "money" and the couple meet with a financial planner, while the voice over explains the financial services First Tennessee offers.  The commercial ends with the couple happily watching television together with the "money," and the voice over states that First Tennessee offers its services so "your money will never feel neglected."  (Doc. No. 47, Ex. 14.)

-14-

The ninth commercial, entitled "Hockey Money," starts with the Nashville Predators, a professional ice hockey team, playing against another team. A Caucasian male in a money costume and his owner, dressed in casual clothes, clumsily get on the ice in skates. The "money" attempts to assist the Predators team, takes a puck in the chest thereby saving a goal, but getting hurt in the process. Then the "money" starts getting rowdy with the opposing team. The owner of the money follows him around somewhat helplessly. The voice over explains that there is a better way to support the Predators, by opening a Predators Checking account at First Tennessee that also comes with Predators' check books and other collectibles. (Doc. No. 47, Ex. 15.)

The tenth commercial, entitled "Stock Car Money," shows a Caucasian male in a one hundred dollar bill money costume sitting with his owner in the back of a stock racing car. The car, which is painted in First Tennessee colors, is driven by a professional stock car driver wearing a First Tennessee helmet. The voice over states that you and your money could be in "for the ride of a lifetime." As the car races around the track, and eventually to victory, the "money" and his owner sit in the back expressing various emotions ranging from excitement, joy to unabashed fear. The voice over explains that by opening a Priority Checking or Business Checking account, the viewer can win a ticket to a race. (Doc. No. 47, Ex. 16.)

First Tennessee's advertising campaign began with "Lazy Money" in January 2001 during the Super Bowl, and continued at least until the filing of Defendants' Motion for Summary. In 2003, JB Oxford discovered First Tennessee's advertisements. Subsequently, JB Oxford filed the present lawsuit alleging copyright infringement and "reverse passing off" under the Lanham Act.

-15-

## II.    STANDARD OF REVIEW

Summary judgment may be granted when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In evaluating a motion for summary judgment, courts must view all the facts and the reasonable inferences to be drawn from those facts in the light most favorable to the non-movant.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The moving party bears the burden of proving the absence of a genuine issue of material fact as to an essential element of the non-movant's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A genuine issue of material fact is one which, if proven at trial, would lead a reasonable fact finder to find in favor of the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

The non-movant may not rely solely on conclusory allegations in the complaint to defeat a motion for summary judgment, but must come forward with affirmative evidence that establishes its claims and raises an issue of genuine material fact.  Celotex, 477 U.S. at 324. Mere allegations of a factual dispute between the parties are not sufficient to defeat a properly supported summary judgment motion; there must be a genuine issue of material fact.  See Anderson, 477 U.S. at 247-48.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  Shah v. Racetrac Petroleum Co., 338 F.3d 557, 566 (6th Cir.

-16-

2003).

The substantive law involved in the case will underscore which facts are material, and only disputes over outcome-determinative facts will bar a grant of summary judgment. Anderson, 477 U.S. at 248. Drawing all justifiable inferences in favor of the non-moving party, the Court must determine whether a reasonable fact finder would be able to return a verdict for the non-moving party and if so, the Court must deny summary judgment. Id. at 249-50. However, if the non-moving party has not "produced enough evidence for a jury to be able to return a verdict for that party," summary judgment should be granted. Tinsley v. Gen. Motors Corp., 227 F.3d 700, 703 (6th Cir. 2000).

## III. DISCUSSION

### A. Copyright Infringement

#### 1. *Ownership*

In order to establish a claim for copyright infringement, a plaintiff must establish that it owns a copyrighted work. Kohus v. Mariol, 328 F.3d 848, 853 (6th Cir. 2003). A certificate of registration constitutes prima facie evidence of the ownership and validity of the copyright, which evidence is rebuttable. Boisson v. Banian, Ltd., 273 F.3d 262, 268 (2d Cir. 2001).

In the present case, JB Oxford has copyright registrations in "Loafing Television," "Loafing Print," "Slinky Television," and "Restaurant." These certificates of registrations are prima facie evidence of JB Oxford's ownership in, and the validity of, the copyrights. Defendants have not contested either JB Oxford's ownership in, or the validity of, the copyrights.

-17-

2.     *Copying*

After proving ownership, the plaintiff must establish that the defendant copied the

plaintiff's copyrighted work.  <u>Kohus</u>, 328 F.3d at 853.  In most cases, as in this case, there is no

direct evidence of copying.  Accordingly, courts must rely on inferences drawn from (1) a

defendant's <u>access</u> to the allegedly infringed work, and 2) the <u>substantial similarity</u> between

defendant's work and the allegedly infringed work.  <u>Murray Hill Publications, Inc. v. Twentieth</u>

<u>Century Fox Film Corp.</u>, 361 F.2d 312, 316 (6th Cir. 2004).  If a plaintiff is able to establish the

inference of copying, a defendant may rebut such an inference with proof of independent

creation of the allegedly infringing work.  <u>Ellis v. Diffie</u>, 177 F.3d 503, 507 (6th Cir. 1999).


i.     <u>Access</u>

Access is proven when a plaintiff shows that the defendant saw or had a reasonable

opportunity to see plaintiff's work, and therefore had the opportunity to copy.  <u>Id.</u> at 506.

"Access may not be inferred through mere speculation or conjecture.  There must be a

reasonable possibility of viewing the plaintiff's work -- not a bare possibility."  4 Nimmer on

Copyright, § 13.02[A], at 13-20 (2006); <u>see also</u> <u>Ellis</u>, 177 F.3d at 506.  An assertion of access

must be supported by probative evidence.  <u>Murray Hill</u>, 361 F.2d at 316.  Where there is no

direct evidence of access, such as when the defendant denies having seen the allegedly infringed

work, circumstantial evidence may be used to demonstrate reasonable access.  Two forms of

circumstantial evidence are accepted as evidence of reasonable access:  (1) a particular chain of

events establishing defendant's access to plaintiff's work, or (2) plaintiff's work has been widely

disseminated.  <u>Three Boys Music Corp. v. Bolton</u>, 212 F.3d 477, 482 (9th Cir. 2000).  In

-18-

addition, "unusual speed in the creation of defendant's work may constitute some evidence that defendant had access to and used plaintiff's work rather than resorting to independent creation." 4 Nimmer on Copyright, § 13.02[C], at 13-32 (2006).

Where access cannot be proved through either direct or circumstantial evidence, the plaintiff must show a <u>striking</u> similarity between the allegedly infringed work and defendant's work, rather than the lower <u>substantially</u> similar standard. <u>Murray Hill</u>, 361 F.3d at 317. "What is required is that the similarities in question be so striking as to preclude the possibility that the defendant independently arrived at the same result. In other words, as a matter of logic, the only explanation for the similarities between the two works must be 'copying rather than . . . coincidence, independent creation, or prior common source.'" 4 Nimmer Copyright, § 13.02[B], at 13-26 (2006).

Plaintiff does not have direct evidence that Defendants saw "Loafing Television," "Loafing Print," "Slinky Television," or "Restaurant" prior to creating their own advertisements. Defendants, in turn, deny having seen any of Plaintiff's advertisements prior to creating their own. As a result, Plaintiff relies on circumstantial evidence to prove that Defendants had a reasonable opportunity to view "Loafing Television," "Loafing Print," or "Slinky Television."[5] First, Plaintiff contends that its advertisements were widely disseminated on a number of cable

_____

[5] Plaintiff cannot determine whether"Restaurant" was ever run. (Doc. No. 51, Ex. 3 at 2.) As a result, Plaintiff has <u>no</u> evidence that Defendants had a reasonable possibility of viewing "Restaurant." Thus, Plaintiff will have to show a <u>striking</u> similarity between "Restaurant" and Defendants' advertisements, rather than the lower <u>substantially</u> similar standard in order to prevail on its copyright infringement claim. Other than stating it has a valid copyright in "Restaurant," Plaintiff does not address this advertisement in its summary judgment brief. As a result, the Court limits its analysis to "Loafing Television," "Loafing Print," and "Slinky Television."

channels, newspapers, magazines and Internet sites that are viewed and available in Tennessee.

In further support of its argument, Plaintiff points to the fact that its advertisements ran in these

national fora for three months at a cost of $ 8,533,923.67.  Second, Patt, the principal creator of

First Tennessee's advertising campaign, read and/or viewed certain of the newspapers,

magazines and cable channels, and Thompson subscribed to one of the newspapers, in which the

advertisements appeared.  Third, Thompson created "Lazy Money" for the Super Bowl, and

"Money Coach" in a relatively short time frame, suggesting that Thompson did not

independently create its initial advertisement.  These three facts, Plaintiff contends, leads to the

conclusion that Defendants had a reasonable possibility of viewing Plaintiff's advertisements.

For purposes of summary judgment, the facts must be viewed in the light most favorable to the

non-moving party.  Under this standard, the Court agrees with Plaintiff's argument that

Defendants had a reasonable opportunity to view, and therefore had an opportunity to copy

Plaintiff's advertisements prior to creating their own.[6]

--------

[6] Without the favorable summary judgment standard, however, Plaintiff may not be able
to demonstrate access.  On the one hand, there is no doubt that Plaintiff's advertisements,
especially of "Loafing Television" and/or "Loafing Print," appeared in a variety of well-known
national media that is available and viewed in Tennessee.  On the other hand, there is no
evidence in the record of how often Plaintiff's advertisements appeared in the national media
accessible in Tennessee.  There is one chart in the record that purports to show when the
advertisements appeared, but it is practically indecipherable on this issue.  (See Doc. No. 51 at
Ex. 3.)  Similarly, Plaintiff's argument that it spent a significant amount of money in a short
period of time, without any context of how much advertising costs and how long advertising
campaigns generally last, is unhelpful.  Without any evidence of the frequency of Plaintiff's
advertisements in the national media, it is uncertain whether Plaintiff can sufficiently
demonstrate "wide dissemination," an important element when attempting to prove access
through circumstantial evidence.  Three Boys Music Corp., 212 F.3d at 482.  Further, Plaintiff's
advertisements appeared in 1999, whereas the alleged copying occurred over a year later,
somewhat undermining Plaintiff's theory of access.

i.     Substantial Similarity

"In the usual infringement case, access can be shown and the more difficult proof is that of 'substantial similarity.'" Murray Hill, 361 F.2d at 317. In analyzing the substantial similarity of the defendant's work with the allegedly infringed work, it is important to keep in mind the principle that all copying does not translate into copyright infringement. This is because copyright protection only extends to the expression of an idea, not to the idea itself. Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 349-50 (1991) (quoting Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 547-48 (1985) ("[N]o author may copyright facts or ideas. The copyright is limited to those aspects of the work-termed 'expression'-that display the stamp of the author's originality.")). Further, copyright protection only extends to the "constituent elements of the work that are original." Feist, 499 U.S. at 347-49 ("Originality remains the sine qua non of copyright; accordingly, copyright protection may extend only to those components of a work that are original to the author.") "[T]he requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be." Murray Hill, 361 F.3d at 318 (quoting Feist, 499 U.S. at 345.)

In keeping with the idea-expression dichotomy and the originality requirement, the Sixth Circuit has adopted a two-part test to determine whether the defendant's work is "substantially similar" to plaintiff's work. "Simply because a work is copyrighted does not mean every element of that work is protected." Boisson, 273 F.3d at 268.

> [Therefore,] the first step 'requires identifying which aspects of the [plaintiff]'s work, if any, are protectible by copyright . . . . The essence of the first step is to filter out the unoriginal, unprotectible elements – elements that were not independently created by the inventor, and that possess no minimal degree of

-21-

creativity, through a variety of analyses. . . .

Kohus, 848 F.3d at 855 (citations omitted) (emphasis added).  Elements to be filtered out include, but are not limited to, ideas, elements dictated by efficiency, scènes à faire,[7] and independently-created elements.  Id. at 856.

> [T]he second [step] 'involves determining whether the allegedly infringing work is 'substantially similar' to protectible elements of the [plaintiff]'s work. . . . Once the unprotectible elements have been filtered out, the second step is to determine whether the allegedly infringing work is substantially similar to the protectible elements of the original.

Id. at 855-56 (citations omitted) (emphasis added).  The Sixth Circuit has mandated that the inquiry in the second prong of the test must be made from the view point of the intended audience.  Id. at 857.  Generally, the intended audience will be the lay public or the ordinary reasonable person, but sometimes it will include an audience that possesses a specialized expertise.  Id.  In the latter case, expert testimony is permissible to educate the trier of fact about the speciality.  Id.

"In copyright infringement cases 'granting summary judgment, particularly in favor of a defendant, is a practice to be used sparingly . . . .'"  Kohus, 848 F.3d at 853.  Nevertheless, summary judgment is "still permissible and may even be required. . . .  One reason to do so is that the question of substantial similarity can usually be decided on the basis of the works

---

[7] Scènes à faire include "'those elements that follow naturally from the work's theme, rather than from the author's creativity,' or elements that are 'dictated by external factors such as particular business practices . . . .'"  Kohus, 848 F.3d at 856; see also Murray Hill, 361 F.3d at 319 ("Scènes à faire are those "'incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic.'"")  Thus, for example, characters that are less developed will have less copyright protection; a work about policemen in South Bronx will necessarily include elements such as "drunks, prostitutes, vermin and derelict cars;" and a work about a dinosaur zoo will necessarily include "electrified fences, automated tours, dinosaur nurseries, and uniformed workers."  Murray Hill, 361 F.3d at 319-20.

-22-

themselves and rarely, if ever, involves questions of credibility, the peculiar province of the jury." Murray Hill, 361 F.3d at 321 (citations omitted).

### a.     First Prong Of Substantially Similar Test: Protectible Elements

The Court need not detain itself with a detailed analysis of the protectible elements of Plaintiff's copyrighted advertisements because Plaintiff essentially concedes that the "idea" of a man in a money costume or unproductive money, the paper currency "costume," the couch potato "scene," and the phrase "Put your money to work," taken individually, are not protectible. Thus, Plaintiff states that while JB Oxford's and Defendants' advertisements share the common phrase "Put your money to work," this commonality "alone cannot support a finding of copyright infringement."  Rather, Plaintiff argues that "JB Oxford communicates the parties' shared metaphor, concept, and idea through its distinctively delineated, currency character 'Bill' . . . . [Therefore,] JB Oxford claims the exclusive right to use 'Bill' to express the metaphor, concept, and idea [of unproductive money], no matter how laziness and productiveness are depicted." (Doc. No. 49 at 22) (emphasis in original).  Plaintiff's claim to have the exclusive right to use Bill to express the idea of "unproductive money" is overly broad.  The more appropriate, but narrower, question is whether Plaintiff's character "Bill" is original and protectible by copyright.

"While characters are ordinarily not afforded copyright protection, characters that are 'especially distinctive' or the 'story being told' receive protection apart from the copyrighted work." Rice v. Fox Broad. Co., 330 F.3d 1170, 1175 (9th Cir. 2002) (citations omitted).  As visual characters are easier to "delineate distinctively" and are "more likely to contain some unique elements of expression," they tend to receive more copyright protection than literary

characters.  Walt Disney Prods. v. Air Pirates, 581 F.2d 751, 755 (9th Cir. 1978); see also Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp., 562 F.2d 1157 (9th Cir. 1977) (finding costumed H.R. Pufnstuf characters from children's television show protectible); Warner Bros., Inc. v. American Broad. Cos., Inc., 720 F.2d 231 (2d Cir. 1983) (finding Superman protectible).

In order for a character to obtain copyright protection, it must be especially distinctive. See Toho Co., Ltd. v. William Morrow and Co., Inc., 33 F.Supp.2d 1206, 1215 (C.D. Cal. 1998) ("While Godzilla may have shifted from evil to good, there remains an underlying set of attributes that remain in every film.  Godzilla is always a pre-historic, fire-breathing, gigantic dinosaur alive and well in the modern world.  This Court finds that Godzilla is a well-defined character with highly delineated consistent traits."); Metro Goldwyn Mayer, Inc. v. American Honda Motor Corp., 900 F.Supp. 1287, 1295-96 (C.D. Cal. 1995) (finding James Bond character was copyrightable because it had an identifiable set of traits); Anderson v. Stallone, No. 87-0592 WDKGX, 1989 WL 206431, at *7 (C.D. Cal. April 25, 1989) ("The Rocky characters are one of the most highly delineated group of characters in the modern American cinema.")

In contrast, "stock" or "basic" character types are not entitled to copyright protection.  In Rice, the court declined to extend copyright protection to a "Magic Magician" character because it appeared in one home video that only sold 17,000 copies, the magician was dressed in "standard magician garb," and his role was limited to performing and revealing magic tricks. 330 F.3d at 1175.  As these characteristics were not any different from ordinary magician characteristics, the "Magic Magician" was not "especially distinctive."  Id.

In the present case, viewing the facts in the light most favorable to the Plaintiff, the Court

-24-

finds that "Bill" in "Loafing Television," "Loafing Print," and "Slinky" is sufficiently distinctive to be protectible by copyright. While Bill is perhaps not as distinctive as Superman, Godzilla, James Bond or Rocky, he is certainly more distinctive than the "Magic Magician" in <u>Rice</u>. To be clear, the "idea" of a man portraying "money" by wearing a costume of an exact replica of a United States one dollar bill is not protectible. However, the "expression" of this idea in the form of "Bill," with his costume, name, and specific character traits, is protectible.

Bill is a balding, Caucasian male dressed in a costume that appears to represent a stack of United States one dollar bills. The dollar bill costume is worn vertically, with cut outs for the face, arms and legs. Bill is wearing a white, form-fitting garment underneath the costume and sneakers. Bill spends most of his time sitting around and "loafing" in a downtown apartment. Bill is easily entertained by watching television, eating, or playing with a slinky. Bill is "owned" by, or subordinate to, a person who expects Bill to work, and is disappointed by Bill's lack of productivity. Bill does not at first glance appear to be very smart, but he has an occasional bright idea, such as contacting JB Oxford. He is innocent, somewhat childlike, and naive, as suggested by the fact that: he bursts into tears after being scolded for not being productive; he suggests finding change in the sofa as an effective tool for earning more money; he is able to maintain an undivided interest in playing with a slinky; he bounces on the couch as he plays with the slinky; and he has a perplexed expression when the slinky is tangled.

Bill's character traits have been sufficiently developed in "Loafing Television," "Loafing Print," and "Slinky Television."[8] He is lazy, unproductive, childlike, innocent, naive and of

_____

[8] If the Court were to view all of Plaintiff's commercials together, it is uncertain whether it would come to the same conclusion, because Bill in "Loafing Television," "Loafing Print," and "Slinky," differs drastically from Bill in "Restaurant" and "Circulate." Bill in "Restaurant"

-25-

average intelligence.  These characteristics alone would not be protectible.  However, taken

together with Bill's costume and his name, the Court finds that the "totality" of Bill's attributes

and traits create a sufficiently developed character.

### b.  Second Prong Of Substantial Similarity Test: Comparison Of Works

Even if a character is sufficiently developed to earn copyright protection, a claim of

copyright infringement will only be sustained if Plaintiff can demonstrate substantial similarity

between Bill and Defendants' characters.  Plaintiff must show that Defendants have copied the

"developed" character, "and not merely the broader outlines."  Smith v. Weinstein, 578 F.Supp.

1297, 1303 (S.D.N.Y. 1984).  In determining whether visual characters are substantially similar,

a court must analyze "not only the visual resemblance but also the totality of the characters'

attributes and traits."  Warner Bros., Inc. v. Am. Broad. Cos., Inc., 720 F.2d at 241.

What the character thinks, feels, says, and does and the descriptions conveyed by

---

appears to be a changed man (apart from the costume).  He is no longer "lazy."  Instead, he
explains that he feels "neglected" and wants to "circulate."  Importantly, Bill is not sitting
around, acting lazy, shabby and eating out of pizza boxes and Chinese take out cartons.  On the
contrary, he is taking his female companion out to a fancy restaurant.  Bill appears to be his
female companion's equal, rather than a subordinate.  Through his conversation, one gathers that
he is more intelligent than Bill in "Loafing Television" or "Slinky Television."  He no longer has
the childlike, innocent, and naive character traits.  Rather, he is suave and sophisticated, and
even offers to pay the check in a humorous manner.  Although portrayed by the same balding,
Caucasian man in the same one dollar bill costume, Bill in "Restaurant" has very different
character traits.  Similarly, Bill in "Circulate" is even more different, as he is shown as dancing
with two attractive women.  He appears to be more of the "good time" Bill, rather than the
"lazy" or "sophisticated" Bill.  In its summary judgment brief, however, Plaintiff is silent about
Bill's characteristics in both "Restaurant" and "Circulate."  It is not surprising that Plaintiff does
not discuss "Circulate," as it has not alleged copyright infringement of "Circulate" in its First
Amended Complaint.  While Plaintiff did allege copyright infringement of "Restaurant," it did
not address this advertisement in its summary judgment brief.  As a result, the Court limits its
analysis of Bill to "Loafing Television," "Loafing Print," and "Slinky Television."

the author through the comments of other characters in the work episodically fill out a viewer's understanding of the character. At the same time, the visual perception of the character tends to create a dominant impression against which the similarity of a defendant's character may be readily compared, and significant differences readily noted.

Ultimately, care must be taken to draw the elusive distinction between a substantially similar character that infringes a copyrighted character despite slight differences in appearance, behavior, or traits, and a somewhat similar though non-infringing character whose appearance, behavior, or traits, and especially their combination, significantly differ from those of a copyrighted character, even though the second character is reminiscent of the first one. Stirring one's memory of a copyrighted character is not the same as appearing to be substantially similar to that character, and only the latter is infringement.

Id. at 241-242.

Both JB Oxford's and First Tennessee's advertisements are intended for the general adult (albeit somewhat affluent) population. As a result, the Court must review the substantial similarity of the advertisements from the lay public's view point. The crux of the similarity between First Tennessee's advertisements and JB Oxford's advertisements is that they both contain "currency characters." That is, "money" is portrayed as having certain human characteristics (such as laziness), and this "money" is represented by people in paper money costumes.

As this case involves visual characters, the Court must first compare the visual perception of the character, as that creates "a dominant impression." Id. at 242. Both JB Oxford's and First Tennessee's costumes are worn vertically, and are exact replicas of United States paper currency. Most of First Tennessee's currency characters wear white, form-fitting garments underneath their money costumes to cover their bare arms and feet, as does Bill, JB Oxford's currency character. There are, however, significant differences in the costumes. JB Oxford's

-27-

costume looks more like a stack of bills, rather than one bill, and is always an exact replica of a one dollar bill. First Tennessee's costumes, however, look more like one bill, and are exact replicas of one, ten, twenty or one hundred dollar bills. Moreover, First Tennessee's costumes vary such that the garment underneath the costume is absent or different. In other instances, accessories are added to enhance the character, such as sweat bands, baseball caps, and whistles. Notwithstanding these differences, however, if focusing solely on the "costume" of the two parties' currency characters, a lay person could find the characters to be substantially similar.

The costume, however, is not the only attribute related to the "currency characters," and the Court is required to focus on the "totality" of the character. The second common denominator is that both First Tennessee's and JB Oxford's "currency characters" take on human characteristics. In JB Oxford's "Loafing Television," "Loafing Print," and "Slinky Television," Bill is lazy, unproductive, childlike, innocent, naive, and of average intelligence. Bill's main characteristics according to Plaintiff, are "laziness" and "unproductiveness."

First Tennessee's advertisements are different because they do not always involve a "single" currency character. In the First Tennessee television commercials in which a single currency character appears, their characteristics are very different from Bill's. Thus, in "Beach Money," the currency character represents a dream or a fantasy. This is emphasized by the voice over urging the viewers to enter the sweepstakes to "meet the money" of their dreams. Similarly, in "Neglected Money" the currency character is "neglected," like a lonely child. This is demonstrated by the voice over asking: "Are you there for your money?" as the currency character runs down the stairs with a baseball glove and a baseball in his hand asking to play. In "Hockey Money" and "Stock Car Money," the characters are fans of the sport and are portrayed

-28-

as avidly supporting and/or participating in the sport. Other than the similarity of the costume, and the fact that the person portraying the money is a Caucasian male, there are <u>no</u> similarities between JB Oxford's Bill and these four First Tennessee currency characters. Importantly, these four First Tennessee currency characters lack the trait that Plaintiff argues is most distinctive about Bill: laziness and unproductiveness.

Similarly, while the overall setting of JB Oxford's advertisements -- the living room, coffee table strewn with sundries, the television, and poorly lit living room -- enhance the idea of laziness and unproductiveness, these four First Tennessee advertisements are completely devoid of the idea of laziness and unproductiveness. Instead, these four First Tennessee advertisements take place in locations that enhance First Tennessee's currency characters specific attributes: the beach for the "dream" currency character, the large, empty suburban house for the "neglected" currency character, the ice rink for the "hockey fan" currency character, and a stock car race track for the "stock car racing fan" currency character.

In the other First Tennessee television commercials, there are numerous currency characters. The inclusion of many currency characters is a significant difference to JB Oxford's single currency character, Bill. Further, each commercial tends to show a different human characteristic, rather than the same characteristic of unproductiveness through laziness. Thus, in "Money Coach," the "coach" is named "Bill," and is a Caucasian male wearing the money costume, accessorized by a baseball cap and whistle.[9] Importantly, First Tennessee's Bill is nothing like JB Oxford's Bill. On the contrary, he is a strict personal trainer, getting other

---

[9] The fact that he is named Bill, however, is of no avail because identical names do not render characters substantially similar. <u>Hogan v. D.C. Comics, L.P.</u>, 48 F.Supp.2d 298, 311 (S.D.N.Y. 1999). The Court is required to look at the underlying characteristics.

"currency characters" in shape. Further, these other currency characters are not portrayed as "lazy," rather they are portrayed as being unfit. Importantly, JB Oxford's advertisements show completely lazy, unproductive money, and the suggestion is that JB Oxford can make it productive. In "Money Coach," while there is perhaps an implicit suggestion of unproductiveness, it is certainly not explicit. Instead, the focus is on making money work at its "peak."

"Kung Fu Money" and "Swimming Money" are also based on the coach/student model. "Kung Fu Money" shows a Kung Fu instructor teaching and fending off surprise attacks from his Kung Fu students. The instructor has an air of wisdom and protection, and his students are practicing Kung Fu skills. Everything the instructor talks about deals with "protection," and "insurance." In "Swimming Money" the coach is singing his way through a very precise, coordinated synchronized swimming performance, which is conducted by female synchronized swimmers in money costumes. These commercials are completely devoid of the human characteristic of "laziness" or "unproductiveness." To the contrary, they portray wisdom, protection, hard work, precision and skill; characteristics that JB Oxford's Bill utterly lacks.

First Tennessee's "Scary Money," "Smart Money," and "Rowdy Money" involve numerous currency characters, as well. "Scary Money," involves three currency characters playing a "ghost" prank. "Smart Money," shows characters with below average intelligence being taught money management skills by First Tennessee representatives. Finally, "Rowdy Money" shows numerous currency characters acting like wild children, and being sent to boot camp to learn discipline. While none of these characters portray "laziness," their childlike behavior, intelligence (or lack thereof) and unproductiveness are similar to JB Oxford's Bill.

-30-

Nevertheless, it is important to note that the "idea" of "unproductive" money is not protectible. Only the "expression" of unproductive money through Bill is. Bill's unproductiveness is expressed through laziness, which is his defining characteristic. "Unproductiveness" in First Tennessee's characters in these three advertisements is not expressed through "laziness." On the contrary, "unproductiveness" is expressed through characters having the time to play a prank, money that is not intelligent, and money acting like wild teenagers. Similarly, these characters are in completely different locations, and expressing various ideas, such as untapped money in home equity ("Scary Money"), stupidity ("Smart Money"), and discipline ("Rowdy Money"). Therefore, while JB Oxford's character simply expresses unproductive money primarily through laziness, First Tennessee's characters express unproductive money in a far more nuanced manner. Importantly, First Tennessee's characters are represented by men and women of different races, while Bill is always a balding, Caucasian male. Other than the fact that the unproductive money is portrayed by people in money costumes, there are very few similarities between JB Oxford's Bill and First Tennessee's currency characters in "Scary Money," "Smart Money," and "Rowdy Money."

In sum, the Court finds that currency characters in most of First Tennessee's television commercials are not substantially similar to JB Oxford's Bill. Although they wear similar costumes, the character traits portrayed by First Tennessee's currency characters are very different from Bill's traits. As explained above, out of First Tennessee's eleven television commercials, seven feature currency characters that do not represent laziness or unproductiveness in any way. Three of First Tennessee's television commercials feature currency characters that are unproductive. Their unproductiveness, however, is displayed in a

-31-

very different manner than JB Oxford's Bill. Thus, the Court finds that these ten television commercials, "Money Coach," "Kung Fu Money," "Beach Money," "Swimming Money," "Neglected Money," "Hockey Money," "Stock Car Money," "Scary Money," Smart Money," and "Rowdy Money," are not substantially similar to JB Oxford's advertisements. Rather, the Court finds that the currency characters in these ten television commercials present

> a somewhat similar though non-infringing character whose appearance, behavior, or traits, and especially their combination, <u>significantly differ from those of a copyrighted character, even though the second character is reminiscent of the first one</u>. Stirring one's memory of a copyrighted character is not the same as appearing to be substantially similar to that character, and only the latter is infringement.

<u>Warner Bros., Inc.</u>, 720 F.2d at 242 (emphasis added).

The Court's conclusion that the currency characters in ten of First Tennessee's television commercials are not substantially similar to JB Oxford's Bill, does not end the analysis. The Court must still analyze First Tennessee's "Lazy Money" television and print advertisements. In "Lazy Money," the television commercial, there are at least half a dozen currency characters. The first three are remarkably similar to JB Oxford's Bill. They are Caucasian males (one of whom is bald), dressed in one dollar bill money costumes, sitting in a poorly lit living room. They are sprawled around the room watching television, and the coffee table is strewn with Chinese food cartons, drinks and other sundries. These currency characters are specifically identified as "lazy" currency characters because the voice over asks: "Do you have lazy money?" These currency characters disappear and are replaced by efficient, "working" currency characters producing "new" money that is ready to be dispensed through an ATM machine. While the first scene of this television commercial and the "lazy" currency characters are very similar to JB

-32-

Oxford's Bill in "Loafing Television," the rest of the characters and the commercial is vastly different. Thus, in "Loafing Television," Plaintiff suggests that you could "Put your money to work" with JB Oxford. First Tennessee's "Lazy Money," however, explicitly shows how one can "put your money to work at First Tennessee" in the factory scene, and have it at your disposal in the ATM scene. Despite these major differences, the Court cannot say that certain aspects of "Lazy Money" are not substantially similar to "Loafing Television." As the first three currency characters in the television commercial "Lazy Money" portray unproductive money through laziness, a reasonable finder of fact could find substantial similarity with JB Oxford's Bill. As a result, summary judgment with regard to the television commercial "Lazy Money" is inappropriate.

Defendants' print advertisement entitled "Lazy Money" involves a balding, male Caucasian actor in a one dollar money costume, and a white, form-fitting garment covering his arms and legs. He is sitting on what appears to be a "La-Z-Boy" chair, or other type of reclining chair. It is difficult to tell from the picture, but he may be holding a remote control in his right hand, implying he is watching television. In comparison, in "Loafing Print," JB Oxford's Bill is reclining on a couch, with his feet on the coffee table. In the crook of one arm is a bowl of popcorn, and in the other hand is a remote control. On the coffee table there is left-over Chinese food, a half-opened pizza box and other sundries. While there are some differences in the costume and the surroundings, both First Tennessee's print "Lazy Money" and JB Oxford's "Loafing Print" attempt to show unproductive money through lazy currency characters dressed in similar money costumes. Viewed in the light most favorable to Plaintiff, a reasonable finder of fact could find the totality of the currency characters' traits in the print advertisement "Lazy

-33-

Money" and "Loafing Print" to be substantially similar because they express the idea of "unproductive" money through "lazy" currency characters that wear similar money costumes and are in similar surroundings.

In sum, the Court GRANTS Defendants' Motion for Summary judgment regarding "Money Coach," "Kung Fu Money," "Beach Money," "Swimming Money," "Neglected Money," "Hockey Money," "Stock Car Money," "Scary Money," Smart Money," and "Rowdy Money." However, it DENIES Defendants' Motion for Summary Judgment regarding First Tennessee's "Lazy Money" television and print advertisements.

**B.      Lanham Act**

Plaintiff also raises a claim for "reverse passing off" in violation of the Lanham Act, 15 U.S.C. § 1125(a).[10] JB Oxford attempts to make a "reverse passing off" claim by contending that

---

[10]  Section 1125(a) provides:

(1)  Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

(A)  is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B)  in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Defendants are distributing JB Oxford's advertisements under First Tennessee's name, with the intent and likely effect of causing confusion as to the origin of the author of the advertisements and provider of the services. It appears that JB Oxford is only alleging a claim under § 1125(a)(1)(A). As such, JB Oxford's claim fails as a matter of law.[11]

"Passing off . . . occurs when a producer misrepresents his own goods or services as someone else's. 'Reverse passing off,' as its name implies, is the opposite: The producer misrepresents someone else's goods or services as his own." Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 28 n.1 (2003) (citations omitted). Or, in other words, "'reverse passing off' occurs when 'A' sells 'B's' product under A's name.'" Dahlen v. Michigan Licensed Beverage Assoc., 132 F.Supp.2d 574, 588 n.12 (citations omitted).

JB Oxford's claim does not fall under the definition of "reverse passing off." First Tennessee is not distributing JB Oxford's advertisements under First Tennessee's name. There is no doubt that First Tennessee is selling its own advertisements under its own name. The Supreme Court made it abundantly clear in Dastar that JB Oxford's claim is not an appropriate

_____

[11] To the extent JB Oxford is also alleging a claim under § 1125(a)(1)(B) on the basis that First Tennessee's advertising misrepresents the nature, characteristics, qualities, or geographic origin of First Tennessee's services or commercial activities or JB Oxford's services or commercial activities, it also fails. Here, First Tennessee's advertisements do not misrepresent First Tennessee's services, nor do they misrepresent JB Oxford's services. Rather, First Tennessee's advertisements accurately promote First Tennessee's services, such as Priority Checking, among other things. First Tennessee's advertisements do not discuss or reference JB Oxford's services in any way. To the extent First Tennessee advertises that it performs the same financial services as JB Oxford, such as financial planning, or produces the same result as JB Oxford, such as a higher rate of return on any money invested, that is simply because First Tennessee and JB Oxford offer the same or similar financial services with the aim of earning the consumer more money. Finally, to the extent First Tennessee's advertising evokes JB Oxford's advertising due to the use of currency characters, any claim JB Oxford has lies in copyright law.

Case 3:03-cv-01117   Document 84   Filed 04/12/06   Page 35 of 40 PageID #: 89

"reverse passing off" claim.

In Dastar, plaintiff Twentieth Century Fox ("Fox") originally held the exclusive rights to a television series entitled "Crusader in Europe," which was based on General Dwight D. Eisenhower's book of the allied campaign in Europe during World War II. Id. at 25. Fox allowed its copyright in the series to expire in 1977, leaving the series in the public domain. Id. at 26. Anticipating a renewed interest in World War II on the 50th anniversary of the war's end, defendant Dastar Corporation ("Dastar") purchased copies of the original, public domain television series. Id. Dastar copied the series and edited them by substituting a new opening sequence, credit page, and final closing, among other changes. Id. at 26-27. Dastar manufactured and sold this edited version under the title Campaigns in Europe as its own product. Id. at 27. Fox and several licensees brought suit, alleging, inter alia, that Dastar's sale of Campaigns in Europe without proper attribution to the Crusade in Europe series constituted "reverse passing off" in violation of 15 U.S.C. 1125(a). Id. The district court and the Ninth Circuit had previously agreed with Fox, concluding that "Dastar's 'bodily appropriation' of Fox's original [television] series is sufficient to establish . . . reverse passing off." Twentieth Century Fox Film Corp. v. Entertainment Distrib., 34 Fed. App'x 312, 316 (9th Cir. 2002). The Supreme Court, however, disagreed and reversed judgment.

Section 1125(a)(1)(A) prohibits "false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion . . . as to the origin . . . of . . . goods, services or commercial activities." The Supreme Court interpreted the term "origin" in § 1125(a)(1)(A) to apply only to "the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or

-36-

communication embodied in those goods." Dastar, 539 U.S. at 37.  The Supreme Court's

interpretation distinguishes Lanham Act claims from copyright claims.  Lanham Act claims, the

Court clarified, "were not designed to protect originality or creativity;" such protection is in the

sole province of the copyright laws.  Id.  Applying its interpretation in Dastar, the Supreme

Court found that had Dastar "bought . . . [the Crusader in Europe] and merely repackaged [it] . . .

as its own," then a "reverse passing off" claim under the Lanham Act would be sustained.

Dastar, 539 U.S. at 31.  "Dastar's alleged wrongdoing, however, is vastly different:  It took a

creative work . . . copied it, made modifications (arguably minor), and produced its very own

series of videotapes."  Id. (emphasis added).  The latter type of action, concluded the Supreme

Court, does not constitute a "reverse passing off" claim under the Lanham Act because there is

no confusion as to who produced the videotapes.

In the present case, the facts are strongly akin to Dastar.  Assuming for purposes of the

Lanham Act claim that Plaintiff has demonstrated Defendants copied its protected

advertisements.  Even after such "copying," however, Defendants made significant changes to

the advertisements.  Fundamentally, Plaintiff's advertisements rely on one character "Bill," who

is lazy and is represented by a Caucasian, balding, out of shape male actor.  In contrast,

Defendants rely on numerous "characters," some of which are portrayed as lazy.  Others

misbehave, play pranks, are incompetent or uneducated, and participate in sports.  These

characters are represented by actors of different sexes and races.

Similarly, Defendants changed the setting of their advertisements.  Defendants' "Lazy

Money" television commercial involves a living room, similar to the Plaintiff's "Loafing

Television" advertisement, but then features a factory and an ATM machine, which were never

even contemplated in Plaintiff's advertisement. Similarly with the "Loafing Print," "Bill" is on a couch, with popcorn, and a coffee table filled with left over food. In Defendants' "Lazy Money" print advertisement, the currency character is on a "La-Z-Boy" or equivalent, and we do not know which room he is in because the background is white. The other ten advertisements involve vastly different settings, e.g., a garden, a swimming pool, a back yard, a beach, an ice skating rink, a stock car race, First Tennessee branch locations and houses. Plaintiff's four advertisements only involve a living room in a downtown apartment and a restaurant.

Finally, while JB Oxford's advertisements sought to educate the viewer about the general financial services it offered, First Tennessee's advertisements focused on one specific financial service during each advertisement, such as its Priority Checking account, insurance, sweepstakes, home equity loans, and its support of stock car racing and the Predators. While some of First Tennessee's advertisements covered general financial services, each advertisement was focused on one or two specific services, such as longer hours or the availability of a financial planner.

As a result, it is clear that even if Defendants initially "copied" Plaintiff's advertisements, Defendants significantly changed the advertisements and produced their own advertisements. As in Dastar, assuming Defendants copied Plaintiff's advertisements, Defendants "took a creative work . . . copied it, made [significant] modifications . . ., and produced [their] very own" advertisements. 539 U.S. at 31. In sum, there is no doubt that First Tennessee, along with Thompson, produced First Tennessee's advertisements to promote First Tennessee's services. Therefore, JB Oxford's "reverse passing off" claim is unsustainable under Dastar, and this Court GRANTS Defendants' Motion for Summary Judgment on Plaintiff's Lanham Act claim in Count

-38-

II of the First Amended Complaint.

**IV. CONCLUSION**

For the reasons stated herein, the Court **GRANTS in part and DENIES in part** Defendants' Motion for Summary Judgment. The Court **GRANTS** Defendants' Motion for Summary Judgment on (1) Plaintiff's copyright infringement claim in Count I of the First Amended Complaint regarding Defendants' advertisements entitled "Money Coach," "Kung Fu Money," "Beach Money," "Swimming Money," "Neglected Money," "Hockey Money," "Stock Car Money," "Scary Money," Smart Money," and "Rowdy Money," and (2) Plaintiff's Lanham Act claim in Count II of the First Amended Complaint. The Court **DENIES** Defendants' Motion for Summary Judgment regarding Plaintiff's copyright infringement claim in Count I of the First Amended Complaint regarding Defendants' television and print advertisements entitled "Lazy Money."


It is so ORDERED.

Entered this the 12th day of April, 2006.




JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT